## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANDRE BOYER and PENNSYLVANIA
S.I.T.E.S. AGENTS, LLC,

                Plaintiffs,

    V.                                                                 Civil Action No. 5:23-CV-02885-JLS

CITY OF PHILADELPHIA, et al.,

                        JURY TRIAL OF 12 DEMANDED

            Defendants.

### PLAINTIFF'S BRIEF IN OPPOSITION TO MOTION TO DISMISS BY DEFENDANTS PHILADELPHIA DISTRICT ATTORNEY'S OFFICE AND DISTRICT ATTORNEY LARRY KRASNER

### STATEMENT OF FACTS

Defendant Lawrence S. Krasner is the incumbent District Attorney of Philadelphia. [ECF No. 18 ¶ 18]. The positions of the District Attorney and his Office are not constituent parts of the City of Philadelphia as a municipality of the First Class. [ECF No. 18 ¶¶ 20-22]. Exhibits A, B, and C to the Second Amended Complaint show the Philadelphia Home Rule Charter – the City's foundational law – makes no provision for the District Attorney and his Office. They also show the District Attorney is not an agent, subordinate, or appointee of the Mayor. Acting autonomously, Mr. Krasner is responsible for hiring, firing, training, and supervising his staff, including deputies, and is accordingly in a position to set his own policies and practices. [ECF No. 18 ¶ 23]. This Honorable Court made this very determination in Sourovelis v. City of Philadelphia, 103 F. Supp. 3d 694, 710 (E.D. Pa. 2015) ("the D.A.'s Office is technically not a department of the City"; the District Attorney is independently elected, and has the authority to appoint his or her assistant district attorneys and detectives). In fact, this Court has held that the Philadelphia District Attorney is a "policymaker" for Monell purposes. Estate of Tyler ex rel. Floyd v. Grossman, 108 F. Supp.

3d 279, 297 (E.D. Pa. 2015). Moving Defendants are therefore independent entities who may be held liable under Monell and the common law under 1983.

Boyer served as a police officer in the Police Department of the City of Philadelphia for 13 years. [ECF No. 18 ¶ 40]. Following this, Boyer has worked as a security guard for a hotel, with the purpose of protecting employees and guests, as well as moneys, valuables, and other property of employees and guests and of the employer itself. [ECF No. 18 ¶ 42]. He also serves in an investigative function: investigating employees in response to complaints by patrons or guests. [Id.]. In addition, within the course and scope of Boyer's employment, he is empowered to conduct a citizen's arrest if any person commits a felony or breach of the peace in his presence. [ECF No. 18 ¶ 43]. These are analogous to the functions of a private detective.

Boyer is the owner and author of a news service named *Serpico News*. [ECF No. 18 ¶ 44]. *Serpico News* dedicates itself to publicizing the conduct of Philadelphia police officers. [ECF No. 18 ¶ 45]. The exposure of police corruption, abuse, and other misconduct has made him a political enemy of Philadelphia authorities. [ECF No. 18 ¶ 47]. His publication of law-enforcement secrets has made him an enemy of various law enforcement authorities, including the District Attorney (who is ultimately a law enforcement officer of the highest grade) and his Office. [Id.].

Overall, law enforcement in Philadelphia has taken a pattern of animus toward him as a result of his work with *Serpico News*. [Id.]. This has included: 1.) impeding and denying his ability to secure a firearms license; 2.) impeding and denying his ability to secure a private detective license under the Private Detective Act ("PDA"); and 3.) pretextually yet serially prosecuting him under the Uniform Firearms Act ("UFA"), 18 Pa. C.S. §§ 6101 *et seq*. [Id.]. This conspiracy *will* continue so long as Boyer remains subject to Philadelphia's jurisdiction. [Id.]. Thus, he pleads the Moving defendants have an ongoing, invidious hatred that exposes him to retaliatory and

discriminatory action in violation of his Constitutional rights.

During all material times and to the present, Boyer held a valid firearms certification under the Lethal Weapons Training Act, 22 P.S. §§ 41 *et seq*. [ECF No. 18 ¶ 41]. As background, the Act creates an "education and training program in the handling of lethal weapons, law enforcement[,] and protection of rights of citizens[.]" § 44(a). This law enables a privately-employed agent to carry a lethal weapon as an incident to his or her employment. Id at (b). In other words, this statute declares employees qualified to carry a firearm during their employment, based on training and education in the handling of lethal weapons.

Boyer once held a firearms license under the UFA, prior to 2016, when the Philadelphia Police Commissioner revoked it. [ECF No. 18 ¶¶ 49-50]. Revocation was affirmed in the administrative, non-judicial case of *In re* Andre Boyer, Appeal No. 28392, before the License & Inspection Review Board for the City of Philadelphia.  [ECF No. 18 ¶ 51].

Deputy Sheriff Robert Lee falsely testified under oath that Boyer admitted to wearing a firearm in a courtroom within City Hall in Philadelphia. [ECF No. 18 ¶ 54]. In reality, the Deputy never saw a firearm on Boyer's holster. [ECF No. 18 ¶ 55]. Lee took no enforcement action against Boyer that day. [Id.]. It is common sense that Lee would have detained Boyer on the spot if he had evidence of such a severe breach of peace and security as bringing a gun to a courtroom. [See Id.]. Regardless, the Board did not permit Boyer to make a full defense. [ECF No. 18 ¶ 58]. Notably, he was dispossessed of his firearms license *without any jury trial*, since the hearing was simply before an administrative Board and the reviewing courts deferred to the Board's record.

Multiple false arrests and prosecutions followed. On December 5, 2019, and while acting within the course and scope of his employment, Boyer went to the 35th Police District Headquarters of Philadelphia to turn over property lost by a departing guest of his employer. [ECF

No. 18 ¶ 59]. After this, he stood in the lobby and began to record a video for *Serpico News*. [ECF No. 18 ¶ 60]. A (non-moving) defendant named O'Shaughnessy asserted he saw him carrying a holstered firearm in the lobby. [ECF No. 18 ¶ 61]. This defendant, or someone acting on his behalf, sought and obtained a warrant to arrest Boyer based on briefly viewing a firearm in a holster without inquiring whether the item seen was in fact a firearm, whether it was operable as a weapon, or whether he had a license or authorization to carry it. [ECF No. 18 ¶ 62]. Boyer was placed under arrest the next day. [ECF No. 18 ¶ 64].

This arrest on December 6, 2019 commenced a criminal action against Boyer in the Philadelphia Court of Common Pleas for a count of Carrying a Firearm Upon the Public Streets or Public Property of Philadelphia, 18 Pa. C.S. § 6108. [ECF No. 18 ¶ 70]. This charge was dismissed. [ECF No. 18 ¶ 79].

A second arrest followed. On or about March 12, 2021, while Boyer was acting within the scope of his employment, Boyer lawfully arrested a man who was trespassing on the hotel's premises where Boyer is employed. [ECF No. 18 ¶ 72]. Boyer effected a citizen's arrest and requested the police department to take the offender into custody. [Id.]. However, upon arrival at the hotel, the police instead arrested Boyer. [ECF No. 18 ¶ 73]. These charges were ultimately dismissed without a conviction. [Id.].

Then, on October 19, 2021, Boyer appeared to testify in a trial at the courthouse commonly knows as the "Criminal Justice Center." [ECF No. 18 ¶ 74]. He arrived from his employment, in full uniform, carrying a bulletproof vest and a holstered firearm on his person. [ECF No. 18 ¶ 75]. Upon entering the Justice Center, he made a request to the sheriffs for permission to deposit his firearm and equipment in the facility's gun locker, which he was permitted to do. [ECF No. 18 ¶ 76]. Seeking to depart after completion of his testimony, Boyer retrieved his firearm and

equipment. [ECF No. 18 ¶ 77]. He was then approached by (non-moving) defendant Lieutenant O'Leary, who questioned whether Boyer had a permit to carry that firearm. [Id.]. Boyer responded that he had a Lethal Weapons Act certification, yet O'Leary detained Boyer's person and confiscated his firearm and equipment. [Id.]. This charge was also dismissed. [ECF No. 18 ¶ 78].

Subsequently, the District Attorney refiled a criminal complaint, after the underlying prosecution had already been dismissed once, based on the December 6, 2019 arrest. [ECF No. 18 ¶ 79]. Boyer was subjected to yet another arrest, and attendant confiscation of his firearm. [ECF No. 18 ¶ 80]. At trial, judgment of acquittal was entered in his favor. [ECF No. 18 ¶ 81].

After all these prosecutions ended in his favor, Boyer sought the return of his confiscated firearm. He filed multiple motions for return of property in the Philadelphia Court of Common Pleas. [ECF No. 18 ¶¶ 83-86]. Despite favorable orders from the Court of Common Pleas, the police and District Attorney's Office only complied with the orders granting his motions for return of property about five months later. [ECF No. 18 ¶ 89].

Following his multiple acquittals and dismissals of all charges, Boyer submitted an application for a license to carry firearms. [ECF No. 18 ¶ 91]. Lt. Wanda Newsome informed Boyer that his application was disapproved for "good cause" because his "character and reputation is such that the individual would be likely to act in a manner dangerous to public safety." [ECF No. 18 ¶¶ 92-93; Exhibit E to the Second Amended Complaint (License Revocation Letter)]. This "good cause" was based on the aforementioned arrests. [ECF No. 18 ¶ 93; Exhibit E (License Revocation Letter)]. This, of course, was not based on any conviction but upon discriminatory animus and unfounded suspicions never proven in court. [ECF No. 18 ¶ 95; Exhibit E (explicitly stating "arrest," rather than conviction)]. As is important, Lt. Newsome relied on facts that *were not proven before a jury in a court of law*. [ECF No. 18 ¶ 96]. Boyer has no criminal *convictions*

that would bar him from receiving a license under the UFA. [ECF No. 18 ¶ 97].

Then the issue becomes his application for licensing as a private detective under the PDA. Boyer filed an application for a license. [ECF No. 18 ¶ 101]. At the hearing, the District Attorney's Office improperly asserted that Boyer's experience in law enforcement was not qualifying under the PDA because of the so-called "Patrolman Exception," which is described at length in the Argument section of this brief. [ECF No. 18 ¶ 102]. The Office misstated the law and ignored controlling authority that would have authorized Boyer's licensure, pursuant to the proper legal analysis of the "Patrolman Exception." [ECF No. 18 ¶ 103].

Under the law as correctly stated and applied, the "Patrolman Exception" does not bar a lower-ranking city officer's application whose experiential duties go above the "patrol function." [ECF No. 18 ¶ 103]. Notwithstanding his nominally lower-level rank, Boyer can present evidence that his experience in the Philadelphia Department goes far beyond the "patrol function." [ECF No. 18 ¶ 104]. Namely, he worked with "5 Square Tactical," which work included investigation and surveillance operations against illegal narcotics traffickers. [ECF No. 18 ¶ 104]. Even had he not been part of this investigative team, entry-level Philadelphia "patrolmen" (holding a position called "Police Officer 1") have extensive experience and responsibilities in criminal and accident investigation, apprehension of criminals, location of property, and evidence collection, *inter alia*. [Id.]. These parallel the responsibilities of private detectives in the private sector, and therefore these "patrolmen" have all the experience commensurate with the ability to perform those functions. [ECF No. 18 ¶¶ 105-08]. Therefore, based on the law as applied to the facts of Philadelphia officers' experience, the Moving Defendants had no good-faith reason to oppose the application, and instead acted invidiously and with discriminatory and retaliatory animus. [ECF No. 18 ¶ 109]. Their misstatements and nondisclosure of the law directly resulted in the denial of

Boyer's application in the Court of Common Pleas. [ECF No. 18 ¶ 110].

Even had Boyer been the "lowest-ranking" member of the police department, entitled "Police Officer 1," these officers have extensive experience above the patrol function in the trade practices of a private detective. [See Exhibit F to the Second Amended Complaint ("Police Officer 1" job specification)]. For example, they: 1.) take action at the scene of crime or accident; 2.) investigate persons suspected of vice crimes; 3.) ascertain validity of information; 4.) secure evidence for the arrest of persons suspected of crime; 5.) search for and preserve evidence; 6.) interview suspects, complainants, and witnesses to evaluate their credibility; and 7.) investigate vehicular accidents. Compare [Id.] with 22 P.S. § 12 (providing for duties of private detectives).

Boyer filed a second application. [ECF No. 18 ¶ 111]. There, Boyer was prepared to offer greater factual support for the relevancy of his experience to the duties of a private detective as set out in the PDA. [ECF No. 18 ¶ 112]. Instead of permitting this, the Moving Defendants opposed the application again, this time relying on the doctrine of collateral estoppel to bar a hearing on the merits. [ECF No. 18 ¶ 113]. Based on this history, Boyer can demonstrate that the Defendants will make every effort to deny him a private detective license in the future. [ECF No. 18 ¶ 116].

Boyer began a side business named "S.I.T.E.S. Agents," an internet business model where requests for private detective services are referred out to licensed service providers under a fee-splitting arrangement. [ECF No. 18 ¶¶ 126-27]. This LLC, together with Boyer, are under an objective threat of prosecution at any time, as even a referral business can require a private detective license. [ECF No. 18 ¶ 128].

## STANDARD OF REVIEW

"In a Rule 12(b)(6) motion, the court evaluates the merits of the claims by accepting all allegations in the complaint as true, viewing them in the light most favorable to the plaintiffs,"

with all reasonable inferences therefrom, "and determining whether they state a claim as a matter of law. The defendant bears the burden of showing no claim has been stated." <u>Gould Electronics, Inc. v. United States</u>, 220 F.3d 169, 178 (3d Cir. 2000) (citation omitted). "[A]n exception to the general rule is that a document integral to or explicitly relied upon" in the non-movant's pleading "may be considered without converting the motion to dismiss into one for summary judgment." <u>*In re* Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997) (quotation omitted).

Under the *Twombly/Iqbal* framework, "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Connelly v. Lane Constr. Corp.</u>, 809 F.3d 780, 786 (3d Cir. 2016) (quotation omitted). The "plausibility standard" does not impose on the plaintiffs to demonstrate a "probability" of success. <u>Id.</u>(citations and internal quotations deleted).

## <u>ARGUMENT</u>

I.   **Moving Defendants Waive All Argument on Plaintiffs' As-Applied Constitutional Challenges and are the Proper Parties for Those Claims; Therefore, Their Motion to Dismiss Should be Summarily Denied.**

After spending the entire Facts Section improperly seeking to color the Court's perception of Plaintiffs with reference to extra-record evidence, the Moving Defendants then casually announce that they "do not address Plaintiff's 'as applied'" constitutional challenges. [ECF No. 21, at 10]. Their Motion and proposed order seek a complete dismissal of Moving Defendants from the case, but it is well-settled that waiver results because the court "is not required to discover or attempt to discover errors" that the moving party "cannot or will not point out." <u>Cont'l Connector Corp. v. Houston Fearless Corp.</u>, 350 F.2d 183, 189 (9th Cir. 1965); <u>accord</u> <u>Epstein v. Whitehall</u>, 693 F. Supp. 309, 315 (E.D. Pa. 1988). Where there "is an aspect of Plaintiff's claim that Defendants' Motion to Dismiss does not address," then defendants have waived the argument and the claim, "therefore, clearly survives Defendants' Motion to Dismiss." <u>Kiely v. Univ. of</u>

Pittsburgh Med. Ctr., 2000 U.S. Dist. LEXIS 3156, at *38 (W.D. Pa. Jan. 20, 2000). Consequently, the Court, at a minimum, must deny Moving Defendant's Motion, because Moving Defendants remain in this case as parties in respect of Plaintiffs' as-applied constitutional challenges.

Without any discussion or citation to authority, Moving Defendants then erroneously assert that they are not the proper parties for Plaintiffs' as-applied constitutional challenges, suggesting in a footnote that Plaintiffs should have joined Pennsylvania Attorney General Michelle A. Henry, who was eliminated as a party in Plaintiffs' Second Amended Complaint. Moving Defendants have waived this issue as well, because factually unsupported, legally undeveloped or non-responsive arguments result in waiver. United States v. Hird, 913 F.3d 332, 355 n. 33 (3d Cir. 2019) (without "a factual basis for such a challenge, we regard the issue to be waived."); Griswold v. Coventry First, LLC, 762 F.3d 264, 272 n.6 (3d Cir. 2014) ("undeveloped argument is insufficient"); Eulo v. Deval Aerodynamics, Inc., 430 F.2d 325, 326 n. 5 (3d Cir. 1970) (waiver where nothing "more than a cursory argument" is offered); Wilson v. Cameron, 2015 U.S. Dist. LEXIS 119637, at *10 (E.D. Pa. Sept. 9, 2015) (party's objection was "non-responsive").

On the contrary, Moving Defendants, rather than Attorney General Henry, are the proper parties here. Plaintiffs seek declaratory and injunctive relief, seeking in Count I to invalidate portions of the Uniform Firearms Act (18 Pa.C.S. §§ 6101 et seq.) on their face or as applied to the facts and circumstances of this case and seeking in Count II to invalidate the statute of 18 Pa.C.S. § 913 on its face or as applied to the facts and circumstances of this case. Where, as here, these are criminal statutes, it is the regular jurisdiction of these Moving Defendants to enforce the same under the statute of 16 P.S. § 1402 of the Pennsylvania County Code. Plaintiffs additionally bring constitutional challenges, facial and as-applied, to The Private Detective Act of 1953 (22 P.S. § 11 et seq.). Under that Act, "The district attorneys of the various counties shall have the

power to enforce the provisions of this act . . ." Id. § 15(a). The function of an injunction is a court-order, barring enforcement. BLACK'S LAW DICTIONARY 904 (10th ed. 2009). Defendant Philadelphia DA's Office, in particular, was created by statute and not by the Philadelphia Home Rule Charter, and remains a distinct party from the City of Philadelphia. Sourovelis v. City of Philadelphia, 103 F. Supp. 3d 694 (E.D. Pa. 2015); Durham v. City of Philadelphia, 2019 U.S. Dist. LEXIS 117909, at *18 n.4 (E.D. Pa. July 16, 2019); 16 P.S. §§ 7201-04.

The Second Amended Complaint details – and Moving Defendants freely admit – that the laws complained of by Plaintiffs were, in fact, enforced against them by the Moving Defendants. [ECF No. 18 ¶¶ 59-90, 101-122]. As a matter of law, that makes the Moving Defendants the proper parties rather than the Pennsylvania Attorney General, by reason of having actually enforced the same laws in the manner of which the Plaintiffs complain. 1st Westco Corp. v. School Dist. of Philadelphia, 6 F.3d 108, 113 (3d Cir. 1993) ("A plaintiff challenging the validity of a state statute may bring suit against the official who is charged with the statute's enforcement only if the official has either enforced, or threatened to enforce, the statute against the plaintiffs"). Neither do Moving Defendants offer any written assurances whether they will refrain from enforcing the laws in the manner complained of, which also brings them into the case. Presbytery of the Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1458 (3d Cir. 1994).

## II.    Plaintiffs have Stated Plausible, Facial Challenges to the Statute of 18 Pa.C.S. §§ 6016(a) and 6108.

Under the Second Amendment and under the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, the Plaintiffs challenge the validity of 18 Pa.C.S. §§ 6106(a) and 6108, on their face or as applied to the facts and circumstances of this case. Under the Equal Protection Clause, "all persons similarly circumstanced shall be treated alike." Plyler v. Doe, 457 U.S. 202, 216 (1982) (quotation omitted). A challenged government action under the Equal

Protection Clause is subject to strict scrutiny "if it discriminates against a 'suspect class' or if it interferes with a fundamental right." Brown v. Borough of Mahaffey, 35 F.3d 846, 850 (3d Cir. 1994). To survive strict scrutiny, the government must show the regulation is necessary to serve a compelling governmental interest and that it is narrowly tailored to further that interest. Adarand Constructors v. Pena, 515 U.S. 200, 235 (1995).

For the entire Commonwealth of Pennsylvania, the Uniform Firearms Act prohibits open carry of a firearm in the City of Philadelphia only. The statute reads in its entirety:

**§ 6108. Carrying firearms on public streets or public property in Philadelphia.**

No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless:

(1) such person is licensed to carry a firearm; or

(2) such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license.

18 Pa.C.S. § 6108. A city of the first class is one containing a population of one million persons or greater. 53 P.S. § 101. Philadelphia is a City of the First Class [ECF No. 18 ¶ 11], and currently the only one in the Commonwealth. Commonwealth v. Bavusa, 832 A.2d 1042, 1044 (Pa. 2003). But as to the rest of the Commonwealth, the Uniform Firearms Act does not impose such liability. In other words, through laws of general applicability, Philadelphians and persons visiting Philadelphia cannot openly carry a firearm within the City unless licensed, whereas all other Pennsylvanians and visitors can do so everywhere else.

For the statute of 18 Pa.C.S. § 6106(a), Plaintiffs limit the scope of their facial challenge "in respect of criminalizing the open carry of a firearm in any vehicle while unlicensed." [ECF No. 18 ¶ 161(b)]. Thus, in all strictness, Plaintiffs do not facially challenge the portion of the statute which criminalizes a person who "carries a firearm concealed on or about his person" and without

a license. 18 Pa.C.S. § 6106(a).

Under the Equal Protection Clause challenge, strict scrutiny is applicable here because "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." McDonald v. City of Chicago, 561 U.S. 742, 778 (2010) (incorporating the Second Amendment against the States). "[T]he Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." New York State Rifle & Pistol Ass'n v. Bruen, ___ U.S. ___, 142 S. Ct. 2111, 2122 (2022). In Bruen, the Court clarified the Second Amendment's protection as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

Id. at 2129-30 (citations omitted). Consequently, 18 Pa.C.S. §§ 6106(a) and 6108 interfere with a fundamental right, namely, to keep and bear arms outside the home for self-defense, requiring application of strict scrutiny under the Equal Protection Clause.

### A.   Facial Challenge to 18 Pa.C.S. § 6108.

Moving Defendants must point to a compelling governmental interest and demonstrate that the statute is necessary for that compelling interest and narrowly-tailored to further the same. But they do none of that. 18 Pa.C.S. § 6108 discriminates against Philadelphians and persons traveling into Philadelphia, giving them fewer rights than all other persons in Pennsylvania. All other persons in the rest of Pennsylvania and outside of Philadelphia, consistent with the Second Amendment of the U.S. Constitution, can openly carry a firearm for self-defense without a license, but Philadelphians and persons traveling into Philadelphia cannot while they are situated within the City. Why is that? A localized, popular animus against gun ownership is not a compelling

governmental interest. Disarming law-abiding citizens within the City is also not a compelling governmental interest. If there is a compelling interest here, Defendants fail to point it out.

Moving Defendants claim the U.S. Supreme Court's decision in <u>Bruen</u> does not cast doubt on the constitutionality of 18 Pa.C.S. § 6108. That is a significant error. In <u>Bruen</u>, the Court reasoned directly in a manner that is fatal to 18 Pa.C.S. § 6108. The Court ruled that cities are *not* "sensitive places" justifying a different result:

> It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. **Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.**

<u>Bruen</u>, 142 S. Ct. at 2133-34 (citation omitted) (emphasis added). And where that could not be done for a single municipality, neither could it be done for the entire State of New York, as did the statute under review in <u>Bruen</u>. Moving Defendants point to the concurrence, but of course, the majority opinion in <u>Bruen</u> controls.

The statute of 18 <u>Pa.C.S.</u> § 6108 was adopted for the first time within the 1972 Crimes Code.[1] Act of Dec. 6, 1972, No. 334, sec. 1, § 6108, 1972 Pa. Laws 1482, 1577. That is more than 100 years after the ratification of the Fourteenth Amendment in 1868.[2] There is no historical tradition in America to exempt an entire city from the fundamental right of openly carrying a

---

[1] Pennsylvania Legislative Reference Bureau, *available at* https://www.palrb.gov/Preservation/Pamphlet-Laws/View-Document/19001999/1972/0/act/0334.pdf

[2] Proclamation of Secretary of State William H. Seward, Certifying that the Fourteenth Amendment of the Constitution has Been Adopted (July 28, 1868), No. 13, 15 Stat. 708.

firearm for self-defense without a license, particularly one as geographically sizable as Philadelphia, being comparable to a County with 130 square miles and one million residents or greater. For purposes of the Equal Protection Clause, the reasoning in <u>Bruen</u> is instructive: That Philadelphia is an urban space and protected generally by the Philadelphia Police Department are not compelling governmental interests which justify the discrimination. Thus, on its face, the statute of 18 <u>Pa.C.S.</u> § 6108 fails under the Equal Protection Clause.

Moving Defendants cite <u>Commonwealth v. Bavusa</u>, 832 A.2d 1042 (Pa. 2003). There, the Supreme Court of Pennsylvania *did not* rule that 18 Pa.C.S. § 6108 survives the Equal Protection Clause. Rather, the *Bavusa* Court simply held that a criminal defendant failed to raise a properly-developed claim on appeal. The *Bavusa* Court reasoned "that mere identification of a geographical disparity is insufficient to establish a constitutional violation," <u>Bavusa</u>, 832 A.2d at 1052, because "appellant has failed to identify the applicable constitutional standards, much less to develop his constitutional claims on such terms." <u>Id.</u>

But there's considerably more here than the fact that <u>Bavusa</u> is not binding on this Court <u>Bavusa</u> did not have the benefit of the Court's teaching in <u>McDonald</u> and <u>Bruen</u>, and therefore applied rational basis review because it did not recognize the right to bear arms as a fundamental right. <u>See</u> <u>Bavusa</u>, 832 A.2d at 1052. That's not the law. The statute of 18 Pa.C.S. § 6108 directly interferes with a fundamental right for Philadelphians and persons traveling into Philadelphia, rather than all persons in the Commonwealth. That bears directly on strict scrutiny under <u>McDonald</u> and <u>Bruen</u>.

Based on the foregoing, Moving Defendants have not carried their burden under the *Twombly*/*Iqbal* framework. Plaintiffs have established a plausible, facial challenge to the constitutional validity of 18 <u>Pa.C.S.</u> § 6108. The Motion should be denied.

14

**B.      Facial Challenge to 18 Pa.C.S. § 6106(a).**

While persons have a "right to carry a handgun for self-defense outside the home," Bruen, 142 S. Ct. at 2122, they also have "the right to travel," which is a "fundamental, personal right," Dunn v. Blumstein, 405 U.S. 330, 338 (1972). They, thus, have a fundamental right to openly carry a firearm while operating a vehicle and "the Constitution presumptively protects that conduct." Bruen, 142 S. Ct. at 2129-30. As mentioned, Pennsylvania does not impose any offense to openly carry a firearm, without a license, while walking on foot. But the statute of 18 Pa.C.S. § 6106(a) imposes a felony on the same conduct but if a vehicle is operated. It is a felony even if the firearm is carried openly within a vehicle, even if the firearm is unloaded and carried openly within a vehicle. See, e.g., Commonwealth v. Biever, 283 A.3d 866, 869 (Pa.Super. 2022) (prosecution for carrying an unloaded firearm in plain view on the floor of a vehicle).

Traveling by vehicle is the most common means of exercising the right to travel and an individual's need for self-defense is no different whether on foot or in a vehicle. At the time of ratification of the Fourteenth Amendment in 1868, there was no historical tradition of imposing criminal penalties for openly wearing a firearm, for self-defense, while riding a horse or stage (a horse-drawn vehicle). Therefore, the statute of 18 Pa.C.S. § 6106(a) fails the test articulated in Bruen because Moving Defendants cannot demonstrate that "it is consistent with the Nation's historical tradition of firearms regulation." Bruen, 142 S. Ct. at 2122.

Under the Equal Protection Clause, Moving Defendants cannot show a compelling governmental interest why the statute discriminates between persons who carry openly while walking on foot versus those who carry openly while inside a vehicle. Furthermore, the statute is not narrowly-tailored for any compelling governmental interest because vehicles are the most common means of travel and Section 6106(b) does not contain any exemption where a firearm is carried openly for purposes of self-defense. Moreover, while some of the exemptions in Subsection

(b) relate to carrying a firearm while unloaded, the U.S. Supreme Court held that that violates the purpose of self-defense in <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008). There, an ordinance in the District of Columbia required all residents, subject to exemptions, to keep their firearms "unloaded and dissembled or bound by a trigger lock or similar device." <u>Id.</u> at 575. This infringed upon the Second Amendment because it "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." <u>Id.</u> at 630. On its face, therefore, the offense of 18 Pa.C.S. § 6106(a) criminalizes constitutionally-protected conduct.

The exemptions in Section 6106(b) do nothing to save the statute. The exemptions all relate to special purposes, such as traveling for the purpose of "target practice," or traveling to one's "place of business," or to a "place of repair, sale or appraisal," or "moving from one place of abode or business to another," etc. 18 Pa.C.S. § 6106(b)(4), (8). Missing from the list of exemptions is a person who carries openly for purposes of "self-defense." <u>Bruen</u>, 142 S. Ct. at 2122.

Even if the legislature created an exemption in Subsection (b) for open-carry for purposes of self-defense, the statute would still fail because these exemptions have been construed as affirmative defenses, where the accused carries the burden of proof rather than the Commonwealth. <u>Commonwealth v. Lopez</u>, 565 A.2d 437, 440 (Pa. 1989). Thus, it creates a chilling effect on Second Amendment rights where a person can openly carry for self-defense, but the Commonwealth reserves the right to prosecute and shift the burden onto the accused to show their self-defense intention. The legislature has the means of avoiding this constitutional entanglement, as other States have done, such as enacting the offense of "possession of a firearm during the commission of a felony," whether the firearm was used or not during the felony. 11 Del. C. § 1447A. Where a firearm is *not* being used or possessed during a criminal offense, persons may carry it openly for self-defense and it matters not whether they're on foot or in a vehicle.

Based on the foregoing, Moving Defendants have not carried their burden under the *Twombly/Iqbal* framework. Plaintiffs have established a plausible, facial challenge to the constitutional validity of 18 Pa.C.S. § 6108. The Motion should be denied.

**III.    Private Detective Act Claims.**

The Plaintiffs raise challenges to Pennsylvania's Private Detective Act ("PDA"), 22 P.S. §§ 11 *et seq*., sounding in Equal Protection and Due Process under the Fourteneth Amendment of the U.S. Constitution. These challenges are facial and as applied to the facts and circumstances of this case. Where Moving Defendants have waived any dismissal of the as-applied challenges, the Court respectfully can consider whether the facial challenges raise a plausible claim to relief under the *Twombly/Iqbal* framework.

Based on the facts above, Boyer's chosen calling is the maintenance of peace, protecting others and their property. The PDA licensing scheme arbitrarily discriminates against people with experience like his, even though they are similarly situated to those it would make eligible for licensure. Meanwhile, and equally arbitrarily, it requires Boyer to get a license to work for his employer, even when he is similarly situated to those who can be employed without a license. Not only all of this, PDA also contains procedural inequalities that violate Due Process.

Historically, the liberty of America's Constitution endows us to pursue any of the lawful professions. Dent v. West Virginia, 129 U.S. 114, 121-22 (1889). Both the Due Process and Equal Protection clauses protect this right. Schware v. Bd. of Bar Examiners, 353 U.S. 232, 238-39 (1957). "A State cannot exclude a person from [any] occupation in a manner or for reasons that contravene" Due Process or Equal Protection. Id. "The right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." Truax v. Raich, 239 U.S. 33, 41 (1915) (affirming injunction against law that led employer to terminate employee)

17

To survive an Equal Protection or Due Process challenge, a law burdening entry into a profession must have a "rational connection with the applicant's fitness or capacity[.]" <u>Schware</u>, 353 U.S. at 239. Even when the law does not discriminate against a suspect class, "a State cannot exclude an applicant when there is no basis for their finding that he fails to meet" standards for fitness or capacity, or where their action is invidiously discriminatory. <u>Id</u>. In other words, liberty to pursue a career "may not be interfered with, under the guise of protecting the public interest," by governmental action "which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect." <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399-400 (1923).

And when reviewing a statute for rationality or legitimate state interest, courts insist on "knowing the relation between the classification adopted and the object to be obtained." <u>Doe v. Bd. of Prob. & Parole</u>, 513 F.3d 95, 107-08 (3rd Cir. 2008).

## A. Standing

Plaintiffs do have standing under Article III of the Constitution. Boyer *will* petition for a PDA license if relief is granted, which *will* expose him to all the perils complained-of at these Defendants' hands. He has experienced, and is daily experiencing, the harm of being excluded from his profession of choice even though he is highly qualified, as a matter of fact, to perform the work of a private detective.

Standing for an action in prospective relief simply requires that the plaintiff is "likely" to suffer future injury from the defendant's illegal conduct. <u>Roe v. Operation Rescue</u>, 919 F.2d 857, 864 (3rd Cir. 1990), *aff'd on remand*, 920 F.2d 213 (3rd Cir. 1990). In fact, where the conduct of a defendant shows an ongoing motive to blockade or shut off the plaintiff's legal rights, the plaintiff has stated a real and immediate threat of future harm. <u>See</u> <u>Id</u>. at 864-65.

In <u>Roe</u>, the Third Circuit overruled the district court's finding that the threatened harm was not real and immediate. The plaintiffs operated clinics that had been shut down before by the

18

defendant demonstrators. Id. Although no one but the defendants could know whether a plaintiff would be targeted again, the facts showed defendants held ongoing animosity against them, so that there was no basis to find the risk would become anything "less" in the future. Id. It was particularly important that the defendant could strike at the plaintiffs without warning. Id. The defendant's historical "*modus operandi*" in opposing the clinics showed the risk to every single clinic was going to stay "real and immediate." Id.

The same should follow here. Plaintiff Andre Boyer has twice petitioned, unsuccessfully and without the intervention of a jury trial, to be licensed under the statute, even though he is highly qualified as a matter of fact to perform the work of a private detective. Plaintiffs plead that Moving Defendants acted with discriminatory and retaliatory animus, and against the law.

They targeted Boyer for malicious prosecution and improper and vexatious denial of a private detective license twice. Specifically, we plead: 1.) Moving Defendants subjected Boyer to a malicious prosecution based on falsified testimony; 2.) after making a citizen's arrest for disorderly conduct, instead of charging the perpetrator-arrestee, the Moving Defendant's charged Boyer falsely and maliciously; and 3.) after the first prosecution was dismissed, Moving Defendants malevolently re-filed charges for the same conduct, with judgment *again* in Boyer's favor.  Given this history of animus, and their motive behind it, it shows the risk – which we have pled – is present and will not diminish.

Therefore, as Plaintiffs show Boyer is the victim of ongoing and systemic animus, the risk stays "real and immediate" that they will interfere with his application in the future or seek to revoke his license if he receives one. In Roe, it was not relevant what means the defendants would actually use once it was established they were likely to use some means. See Id. at 864 ("the dismissed clinics' inability to prove that Operation Rescue has specifically targeted them [for

19

specific sorts of interference]" did not lessen the risk of invasion that could be enjoined). So there is a causal connection between the history and the prospective relief requested, where Boyer will apply for a license in the future that will expectably be opposed.

Moving Defendants misplace their "contingency" and "remoteness" arguments under Pryor. In Pryor, the existence of legal damages depended on whether the NCAA would grant plaintiff an extension, and nobody in the lawsuit could possibly guess the independent conduct of this third party in the future. But here, Plaintiffs' damages do not depend on intervening acts of an unaccountable third party. Injury depends only on Moving Defendants' acts, and we have met the standard under Roe to show that their demonstrated animosity means the opposition is likely to recur. Therefore, damages are not so remote or contingent as to defeat standing. Additionally, standing was denied in Pryor because the future choices of Plaintiffs *themselves* were in control of contingent events that could render injunctive relief moot. Obviously, Plaintiffs here are not in control over the District Attorney's future opposition to the license request.

Furthermore, Plaintiffs describe how Boyer has a fundamental right to work in a chosen, lawful profession within the community. The Supreme Court has found standing for members of the public to challenge a licensing statute when seeking to vindicate a fundamental right, whether or not they would ultimately be issued a license. Freedman v. Maryland, 380 U.S. 51, 56 (1965). "One who might have had a license for the asking may call into question the whole scheme of licensing" when he is prosecuted for failure to procure it. Id. Plaintiffs seek to protect their fundamental rights against unlimited District Attorney discretion. Plaintiffs are imminently threatened with prosecution for failing to obtain a license.

As to their subject matter jurisdiction claim, Moving Defendants woefully fail to develop it with any argument from the facts or citation to controlling law. They, in fact, explicitly state

they are "unclear" whether their putative argument could succeed or has any basis. It can accordingly be disregarded as frivolous, vexatious, and waived. Therefore, Moving Defendants fail to show Plaintiffs lack standing to advance their PDA claims.

### B. Equal Protection

The PDA contains multiple affronts to Equal Protection, and Moving Defendants cannot show a rational basis for disparate treatment under the law.

After Defendants' waiver leaves us with only the facial challenges before the Court, we must regard the "Patrolman Exception" as a case of discrimination. 22 P.S. § 14(a), providing for eligibility based on experience, makes eligible an applicant who establishes to the trial court that he or she has been employed in law enforcement as "a detective" or as a member of many designated law enforcement agencies for three years. It extends to "a member of a city police department" but only "of a rank or grade higher than that of patrolman." Id.

This discrimination against city employees comes without a rational relationship to the fitness or capacity to perform the essential duties of a private detective. See Schware, 353 U.S. at 239. But the experience of lower-grade officers in Philadelphia entrusts them with the *same duties* as a private detective performs in the private sector. [ECF No. 18 ¶¶ 104-107]. The job specification of what the District Attorney's Office would consider a Philadelphia "patrolman" supports this, without having to reiterate every equivalence defined in the Complaint. [ECF No. 18 ¶ 106 (citing Exhibit "F" (job specification of City of Philadelphia's "Police Officer 1," the entry-level grade for police officers, which the District Attorney's Office would associate with the rank of "patrolman"))]. The duties of a "Police Officer 1" largely parallel the duties a private detective performs: criminal and accident investigation, tracing and identification of persons, collecting and handling evidence, etc. Likewise, a Philadelphia "Police Officer 1" has graduated with the same training from an accredited police academy. [ECF No. 18 ¶ 108].

21

The distinct treatment of a Philadelphia sheriff further illustrates the arbitrariness. The "Police Officer 1" would be a disqualified "patrolman." Whereas, the office of Sheriff of Philadelphia can be held by just any civilian without law enforcement experience. The statute establishing the position of sheriff in Philadelphia requires no law enforcement training or experience whatsoever as a condition for eligibility. <u>See</u> 16 P.S., Ch. 3, Art. X(A) (§§ 7501-7522). So administrative civilians qualify for a private detective license by virtue of being elected to an administrative position. Meanwhile, a Police Officer 1 is not qualified, despite manifest experience. Neither does a deputy sheriff or chief deputy require any law enforcement experience or training. 16 P.S. §§ 7509 and 7519. The "patrolman" eligibility criterion has no logical or practical correlation with the duties of a private detective.

We therefore request the Motion to Dismiss be denied.

### C.  Procedural Due Process

The Motion should be denied. Considering facial challenges, we have: 1.) permitting district attorneys to petition the court of common pleas to revoke a license without authorizing a reciprocal right for applicants to petition for relief from improper denial; and 2.) applying the doctrine of *res judicata* or collateral estoppel in excess of the term a license lasts.

The core of procedural Due Process is a protection against arbitrary governmental actions. <u>See</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539, 558 (1974). And per the above, the right to practice one's chosen profession without unreasonable governmental interference is a liberty and property interest protected by (procedural) Due Process. At the very least, it is a protectable liberty interest, regardless of its status as property.

To meet Constitutionally-adequate procedural Due Process, a state should provide "reasonable remedies to rectify a legal error by a local administrative body," such as a District Attorney's Office, opposing an application. <u>Khodara Env'tl, Inc. ex rel Eagle Env'tl, L.P. v.</u>

Beckman, 237 F.3d 186, 197 (3rd Cir. 2001). And the opportunity to be heard must be provided in a meaningful time and in a meaningful manner. Armstrong v. Manzo, 380 U.S. 545, 551 (1965).

Plaintiffs aver that proceedings for a PDA license procedurally favor the District Attorney's Office. A District Attorney has the privilege to immediately "rectify" a grant of licensure by petitioning a court at any time. Conversely, PDA procedure does not permit an immediate and meaningful right for denied applicants to "rectify" the District Attorney's first opposition at a neutral hearing. Moving Defendants respond that a denied applicant can appeal the denial, and this is all the process they ought to receive. But the appeals process is longer, and for the unsuccessful applicant, the standard of review on appeal may automatically defer to the version of the facts in favor of the District Attorney below. E.g., Commonwealth v. Hudson, 2020 Pa. Super. Unpub. LEXIS 3132, at *7 (Oct. 5, 2020) (citing Joseph v. Scranton Times, L.P., 129 A.3d 404 (Pa. 2015)) (in appeal from trial court's PDA decision, appeals court is "bound by factual determinations of the trial court"). Whereas, if the denied applicant can immediately petition the Court of Common Pleas, the fact-finding will be neutral and will not automatically favor the District Attorney. Fact-finding deferential to thegovernment is not a full judicial remedy, since it does not involve a completely-neutral judiciary.

The remedy for loss of an important interest should be closest in time to the denial, and should demand the government justify it under law, rather than forcing the citizen to seek a remedy after the fact. "Absent extraordinary circumstances, courts have usually found that due process requires" access to procedure *before* the loss. Montanez v. Beard, 344 Fed. App'x 833, 834-35 (3rd Cir. 2009) (emphasis added). The government's interest in administering the law does not overcome the "default requirement" that individuals be provided a remedy in advance, and post-deprivation remedies, such as an appeal, do not suffice outside exigencies. See Montanez v. Sec'y

Dep't of Corrections, 773 F.3d 472, 485 (3rd Cir. 2014). The mere *possibility* of a reversal of the District Attorney's opposition on appeal does not preempt the need, and preference, for an *immediate* process to correct the erroneous denial. See Zinermon v. Burch, 494 U.S. 113, 132 (1990) ("In situations where the State feasibly can provide a pre[-]deprivation hearing before [depriving a person], it generally must do so regardless of the adequacy of a post[-]deprivation . . . remedy to compensate for the taking"). Here, there is no pre-deprivation notice and hearing, because all the denied applicant can do is seek a *post hoc* reversal of the District Attorney's opposition. We can therefore reject Moving Defendant's argument based on the availability of an appeal.

Defendants raise *res judicata* and collateral estoppel in their briefs. But the way they aver that these should bar substantive rights would also lead to a deprivation of procedural Due Process. The Plaintiff and similarly-situated individuals do not seek a re-litigation of facts. Rather, in administrative proceedings, the facts change eligibility as time goes on. The facts at issue here are not historical—they change with time, as they are geared at "fitness" for licensure.

The Defendants' view of preclusion doctrines, if allowed to run rampant in a licensing regime, begin to resemble an irrebuttable presumption. Being denied once—for any reason—makes it conclusively "proven" that one is unfit to serve, forever. In essence, application of *res judicata* or collateral estoppel denies a benefit because an individual possesses a certain characteristic that becomes legally immutable – having been rejected *once*. Laws that conclusively deem a fact "proven" at a person's expense and without rebuttal are said to involve the "irrebuttable presumption doctrine." Malmed v. Thornburgh, 621 F.2d 565, 574 (3rd Cir. 1980) (describing how this doctrine "emanates" from Supreme Court precedent).

Where a statute affecting a Constitutional interest contains an irrebuttable presumption, it

violates Due Process if the presumed conclusion is not necessarily or universally true. Id. "A presumed fact must be based on reason[.]" Id. When the effect of the presumed conclusion is to deny a fundamental right or entitlement, our Supreme Court has denounced such laws in the contexts of voting rights, college tuition, driver's license suspension, child custody, and pregnancy disability. Miller v. Carter, 547 F.2d 1314, 1316-19 (7th Cir. 1977), aff'd, 434 U.S. 356 (1978) (collecting Supreme Court cases); see also Clanton v. Orleans Parish Sch. Bd., 649 F.2d 1084, 1093 (5th Cir. 1981).

In a licensing system, the Supreme Court has held that an irrebuttable presumption deprives a property interest without individualized adjudication, on whether the facts at issue rationally connect to the state's interest in regulating the license. Bell v. Burnson, 402 U.S. 535, 539 (1971). In Bell, the High Court struck off a state's mandatory revocation of a driver's license where an accident occurred and the driver reportedly causing the accident failed to guarantee financial responsibility. Id. The issue was the irrebuttable presumption that a driver named as the one "at fault" was actually negligent or culpable without permitting an adjudication of the level of fault. Id. That is, the law allowed no adjudication to show the facts at issue rationally connected to the state's interest in regulating drivers. Likewise here, the preclusion doctrines violate Due Process by automatic deprival of a license, without any adjudication on whether changed facts can now comport with the state's interest in regulating entry into the profession. We can therefore say that the application of preclusive effects violates Due Process.

"A state may not grant preclusive effect in its own courts to a constitutionally infirm judgment[.]" Kremer v. Chemical Construction Corp., 456 U.S. 461, 482 (1982). Preclusion doctrines should not apply where the plaintiff did not have a "full and fair" opportunity to litigate the claims. Id. at 480-81. For the reasons given above, applicants like Boyer do not have that

opportunity, since they cannot bring a petition for grant of a license, with the guarantee of a neutral fact-finder, once the District Attorney brings about a denial.

Despite movants' argument that Boyer's second application is, in their argument, the same as his first, this is a facial challenge, such that we disregard his applications but consider the class of similarly-situated individuals as a whole.

### D.  Substantive Due Process

For substantially the same reasons offered for our Equal Protection argument, Plaintiffs state a survivable facial claim under substantive Due Process, where Moving Defendants waive their attacks on the remaining as-applied claims. We state that: 1.) the "Patrolman Exception" burdens Plaintiffs' interest in the free pursuit of a trade unreasonably; and 2.) this unreasonable restraint lacks any rational connection to the duties expected of a private detective, so that it is not based on real qualifications.

Boyer has experience in the functions within the responsibility and power of a private detective. This is true not only for Boyer but for many holding the title of "Police Officer 1" or synonymous titles throughout the city departments of Pennsylvania. The decision to deny those city police officers like himself a license based on their nominal "rank," disconnected from their experience, has no rational relationship to their fitness to perform. They can have substantially equivalent and relevant experience irrespective of rank. The denial of a license based on a factor utterly disconnected from performance of the tasks at hand is arbitrary, based on citations immediately under Heading III.

Plaintiffs are unaware what relevance Defendants' citations have. McCool did not involve a law prohibiting work as a firefighter: it only disallowed work *for Philadelphia*. And their next citation is to a dissenting opinion that relies on the Justice's own view of the statute's importance, not the law. Instead, Plaintiffs have stated claims that may survive.

26

IV.   **Due Process Requires the Right to a Jury Trial Before Depriving Applicants of their Interest in Their Profession**

In addition to the procedural and substantive infirmities detailed above, both licensing schemes are fallible as they violate the jury's role that must precede any serious loss of right. We provide a schematic overview of the professorial argument in PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? Plaintiffs will supplement this argument should the Court request advocacy.

Hamburger's historical analysis shows that the framers and ratifiers of the Due Process Clauses understood the full judicial process, with jury and all, as an essential predicate to the loss of liberty and property. The concept of Due Process, embedded in Constitutional text, requires the executive to proceed only by commencing process through ordinary courts of justice when it is to deny a fundamental freedom, such as the freedom of profession. Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 YALE L.J. 1672, 1679 (2012), cited with favor in, Wooden v. United States, 142 S. Ct. 1063, 1082 (2022) (Gorsuch, *J.*, concurring, joined by Sotomayor, *J.*); U.S. Dep't of Transp. v. Ass'n of American Railroads, 575 U.S. 43, 72 (2015) (Thomas, *J.*, concurring); PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 297 (2014), cited with favor in, Axon Enter., Inc. v. FTC, ___ U.S. ___, 143 S. Ct. 890, 909-10 (2023) (Thomas, *J.*, concurring, joined by Gorsuch, *J.*). The requirement for a jury trial is binding on the legislature and cannot be done away with by a statutory arrangement.

This understanding of the jury prerequisite emerges from the common-law tradition, where the Founding generation was familiar with the abuses of non-jury courts in England, which deprived British subjects of fundamental rights and protections through the executive branch of government. Parliament's abolition of these special courts – Star Chamber and the Commissioners for Causes Ecclesiastical – was a revolution in our common law heritage that was meant to restore

27

the role of the jury as a bulwark against the executive's arbitrary conduct.

We will further develop this thesis upon the Court's request or at another opportune time in these proceedings. For now, the Court may refer to Hamburger's erudite work if it does not request further advocacy by Plaintiffs. Plaintiffs respectfully advance that Constitutional history and law is open to the requirement for a jury proceeding by an executive agency seeking to dispossess a person of liberty.

**V.    Monell Claims**

Moving Defendants seek dismissal under Monell v. Dep.'t of Soc. Servs., 436 U.S. 658 (1978) and its progeny, but in substance their argument sounds under immunity. Simply stated, Monell is inapplicable to Plaintiffs' claims for prospective relief against these Moving Defendants. Counts 1 through 5 do not depend on establishing liability of Moving Defendants through any past actions or omissions of any of their employees. Rather, the Second Amended Complaint sets forth the extent the UFA and PDA have been enforced. To the extent the narrative sets forth grounds for damages arising from past conduct, the Second Amended Complaint does not lodge any claims for damages against these Moving Defendants.

It is well-settled that "individuals, who, as officers of the State, are clothed with some duty in regard to the enforcement fo the laws of the State, and who threaten and are about to commence proceedings . . . to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action." Ex parte Young, 209 U.S. 123, 155-56 (1908). Therefore, "It is the settled doctrine of this court that a suit against individuals for the purpose of preventing them as officers of a State from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the State within the meaning" of the Eleventh Amendment. Id. at 154 (quotation omitted). In that case, Defendant Edward T. Young was the Attorney General of Minnesota. Id. at 169. The Philadelphia

District Attorney's Office, on the other hand, is neither a Commonwealth agency nor a department of the City of Philadelphia. Sourovelis v. City of Philadelphia, 103 F. Supp. 3d 694, 710 (E.D. Pa. 2015) (Phliadelphia District Attorney's Office "is technically not a department of the City, but is a separate entity created by state law."); Carter v. City of Philadelphia, 181 F.3d 339, 350 (3d Cir. 1999) (Phialdelphia District Attorney's Office is not a Commonwealth agency).

In Los Angeles County v. Humphries, 562 U.S. 29 (2010), the U.S. Supreme Court clarified that Monell is implicated where a plaintiff seeks to hold a municipality liable "for the acts of others," that is, "because it employs a tortfeasor." Id. at 36. But Monell is not implicated if a plaintiff sues a municipality "for its own violations of federal law." Id.

Here, Counts 1 through 5 of the Second Amended Complaint are predicated on Young rather than Monell. By the same token, Monell has no applicability to Defendant Krasner because he is an individual, not a municipality.

The manner in which the UFA and PDA have been enforced by way of criminal prosecutions by the Moving Defendants or their subordinates, as alleged in the Second Amended Complaint, support reasonable inferences of policies and customs — and if that were not so, then such fact defenses cannot be considered at this stage of the litigation, where all allegations and reasonable inferences are read in favor of the Plaintiffs on a Rule 12(b)(6). The manner in which the UFA and UDA have been enforced, as well as the case of Anderson, are sufficient to establish credible threats of enforcement for purposes of prospective relief. Voluntary cessation by the Moving Defendants will not ordinarily preclude a ripe case or controversy. Paragraph 193 was intended to be construed as showing objectively credible threats of prosecution by Moving Defendants for purposes of Young, not as a stand-alone claim for damages, where Counts 1 through 5 do not seek damages against these Defendants.

Moving Defendants then focus on immunity-type arguments. The qualified immunity defense "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." Taylor v. Vermont Dept of Educ., 313 F.3d 768, 793 (2d Cir. 2002). As to Defendant, Philadelphia District Attorney's Office, "Municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983." Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 166 (1993).

Moving Defendants correctly point out that criminal process runs in the name of the Commonwealth and the "Commonwealth is not subject to liability under Section 1983." [ECF No. 21, at 23]. But they err by patently disregarding the U.S. Supreme Court's decision in Young where prospective relief only is sought against them. Further, the U.S. Court of Appeals for the Third Circuit has expressly rejected any Eleventh Amendment immunity from damages as applied to the Philadelphia District Attorney's Office in Carter v. City of Philadelphia, 181 F.3d 339 (3d Cir. 1999), because the office is created under State law as having a "local status" and is not enumerated as a Commonwealth agency. Id. at 348-50. "Pennsylvania's statute defining the scope of sovereign immunity does *not* encompass district attorneys within its detailed definitions of the agencies and employees protected from suit." Id. at 350 (citing 42 Pa.C.S. §§ 102, 8501 to 8528) (emphasis in original)).

Carter is controlling and Moving Defendants neither mention it nor attempt to distinguish it, which is improper. Instead, Moving Defendants rely upon Pownall v. Kranser, 2023 U.S. Dist. LEXIS 95911 (E.D. Pa. June 1, 2023) and Whitfield v. City of Philadelphia, 587 F. Supp. 2d 657 (E.D. Pa. 2008), which related to claims for damages based on past conduct for prosecutorial decision-making. Both of those cases implicated prosecutorial immunity for individual defendants, not Defendant Philadelphia District Attorney's Office. Here, as applied to Moving Defendants

(including especially Defendant Krasner), Counts 1 through 5 of the Second Amended Complaint do not implicate <u>Pownall</u> or <u>Whitfield</u>, because prospective relief is sought only.

Based on the foregoing, the Moving Defendants' arguments under <u>Monell</u> should fail. We respectfully ask this Court to deny the Motion to Dismiss.

## <u>CONCLUSION</u>

Based on the forgoing, the Motion to Dismiss should be denied. Alternatively, Plaintiffs should be given leave to amend.

**CORNERSTONE LAW FIRM, LLC**

Dated: December 18, 2023

By:<u>/s/ Joel A. Ready</u>
Joel A. Ready, Esquire
PA Attorney I.D. # 321966
8500 Allentown Pike
Suite 3
Blandon, PA 19510
(610) 926-7875